**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

| | | |
|---|---|---|
| AUTUMN BROWN | § | PLAINTIFF |
| | § | |
| | § | |
| | § | |
| v. | § | Civil No. 1:21-cv-171-HSO-RPM |
| | § | |
| | § | |
| | § | |
| BELLSOUTH TELECOMMUNICATIONS, | § | |
| LLC | § | DEFENDANT |

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT
BELLSOUTH TELECOMMUNICATIONS, LLC'S MOTION [49] IN LIMINE
TO LIMIT TESTIMONY OF PLAINTIFF'S RETAINED EXPERT, GREGORY
L. SMITH, M.D., M.P.H.**

In this car-accident case, this matter comes before the Court on Defendant

BellSouth Telecommunications, LLC's ("BellSouth" or "Defendant") Motion [49] in

Limine to Limit Testimony of Plaintiff's Retained Expert, Gregory L. Smith, M.D.,

M.P.H.  The Court heard argument on the Motion [49] at a hearing held on

September 21, 2023, and directed the parties to submit supplemental briefing in a

text-only order entered on September 22.

Defendant argues that Dr. Smith's life care plan, which purports to project

$345,337.00 in future medical damages for Plaintiff Autumn Brown ("Plaintiff" or

"Brown"), *see* Doc. [34-3], lacks a sufficient basis in facts and data.[1]  Defendant

asserts the future treatments the plan outlines lack support in Plaintiff's medical

---

[1] As discussed *infra* at footnote 4, Plaintiff stipulated at the September 21, 2023 Pretrial Conference
that she will not seek damages related to gastrointestinal and gynecological needs.  This stipulation
removes $30,672.00 from Dr. Smith's original $345,337.00 projection.

records.  *See* Fed. R. Evid. 702(b) (expert testimony must be "based on sufficient facts or data").  And Plaintiff does not claim that she will offer expert testimony about future medical treatments; the Court has in fact granted Defendant's Motion [47] in Limine to Preclude Plaintiff's Medical Witnesses' Opinions or Testimony Regarding Future Medical Procedures and Costs as unopposed.  Doc. [62].  Defendant therefore contends the Court should preclude Dr. Smith from testifying to the conclusions he drew in his life care plan.  Having reviewed the parties' submissions and relevant legal authorities, the Court agrees with Defendant that Dr. Smith's life care plan lacks a sufficient basis in facts or data, and it will therefore grant Defendant's Motion [49].

## I. DISCUSSION

### A.    Plaintiff's medical treatment

According to Plaintiff, who is currently twenty-two years old, on June 24, 2020, a vehicle driven by Defendant's employee struck her motor vehicle at the intersection of Pascagoula Street and U.S. Highway 90 in Pascagoula, Mississippi.  Doc. [1] at 2–3.  This accident gave rise to Plaintiff's negligence suit.

To support a claim for damages for future medical treatment, Plaintiff designated Gregory L. Smith, M.D., M.P.H., to prepare a life care plan to project the costs of her future medical treatment for injuries from the accident.  Doc. [34-1].  Dr. Smith based his life care plan on his review of Plaintiff's medical records and an interview with her.   Doc. [34-3] at 2.  He did not examine her, and the life care plan does not specify whether the interview was in-person.  *See id.* at 1–2, 12.  The plan

contains a section that reviews Brown's past treatment as reflected in her medical

records.  This section indicates that emergency medical services immediately

transported Plaintiff from the accident scene to Singing River Hospital.  Doc. [34-3]

at 4.  The Emergency Department found that she had suffered a broken right wrist

and various broken bones in her pelvic area.  *Id.*  She also had a fractured lumbar

vertebra and liver laceration.[2]  *Id.*

The Emergency Department transferred Plaintiff to USA Medical Center in

Mobile, Alabama, for further care.  *See id.* at 5.  There, a general surgeon performed

diagnostic testing which confirmed the injuries described above and revealed that

Plaintiff also had a ruptured bladder.  *Id.*  She was admitted to an intensive care

unit, and an orthopedic surgeon and a urologist were consulted.  *Id.* at 5–6.

Plaintiff was discharged on July 2, 2020, with a plan to follow up with a urologist

and an orthopedist.  *Id.* at 6.

After discharge from the hospital, Plaintiff began seeing a physical therapist

and an occupational therapist.  Doc. [34-3] at 6–7.  She first saw the physical

therapist on August 7, 2020.  *Id.*  She was initially unable to stand without minimal

assistance.  *Id.*  The plan was for her to return to physical therapy two times per

week for twelve weeks.  *Id.*  Her "[f]inal visit" occurred on October 27, 2020.  *Id.*

Plaintiff "report[ed] [] improved pain symptoms" and stated that she wanted "to get

back to gym."  *Id.*  According to Dr. Smith, the plan was then to "[c]ontinue plan of

---

[2] The Court takes the facts that Dr. Smith states from Plaintiff's medical records on their face given Defendant's Motion [49] in Limine does not challenge their accuracy but instead argues they are insufficient to support the conclusions in the life care plan.

care," but the life care plan does not describe the plan of care.  *Id.*

Meanwhile, Plaintiff was referred to occupational therapy "for evaluation and treatment of [her] right wrist," which she had fractured.  Doc. [34-3] at 7.  She began occupational therapy on August 18, 2020, with "a removeable brace on [her] right wrist."  *Id.*  Plaintiff was to return "two times per week for eight weeks," and Dr. Smith's report notes that the occupational therapist's record indicates a "[f]inal visit" on October 8, 2020.  *Id.*  The note adds: "The patient is progressing well," and concludes with a "[p]lan" to "[c]ontinue therapy sessions," though the life care plan does not refer to any records of subsequent sessions.  *Id.*  Plaintiff testified in her deposition that she has not had any physical or occupational therapy since the Fall of 2020.  Doc. [71-1] at 97.

Beyond the foregoing medical records, Dr. Smith's lifecare plan discusses a few visits to obstetrics and gynecology centers and a gastroenterologist between late September 2020 and April 2022.  *See* Doc. [34-3] at 7–8.  Plaintiff also visited Memorial Hospital in Gulfport, Mississippi, for gastrointestinal issues in January 2022.  *Id.* at 8.  However, Plaintiff's medical care for gynecological and gastrointestinal issues will not be an issue at trial.  *See infra* note 4.

The section covering Plaintiff's medical treatment concludes with a paragraph that presumably came from Dr. Smith's interview with her.  Dr. Smith notes: "Ms. Brown states that she is still seeing her gynecologist, gastroenterologist, and primacy [sic] care provider for the residual conditions from the injury."  Doc. [34-3] at 9.  She also "states that she has been released by her orthopedist and

urologist," and "that no procedures or surgery is currently planned." *Id.*

B.     Dr. Smith's life care plan

Under "[c]omplaints," the life care plan outlines what Plaintiff presumably relayed during her interview with Dr. Smith on November 4, 2022. Doc. [34-3] at 2, 11–12. Plaintiff reported that she "has no control of her rectal or vaginal muscles," has "difficulty controlling her bowel movements," gets "recurrent episodes of spasms in her low back and pelvic areas," has issues with incontinence, and has "ongoing mechanical neck, low back, pelvis, and hip pain," which causes stiffness and decreased range of motion. *Id.* at 11. She further stated she has mental health issues, which she attributes to the accident.[3] *Id.*

As to "[t]reatment," Dr. Smith's life care plan lists a "[h]ome exercise program," "Flexeril as needed for spasms," and that Plaintiff "states that her mother has a transcutaneous electrical nerve stimulation (TENS) unit and that she would like to try one at home." Doc. [34-3] at 11. The life care plan also states that "Ms. Brown has ongoing collar/neck, hip, wrist, and abdomen pain that is associated with a significant physical functional impairment that affects several [activities of daily living]." *Id.* at 12.

Dr. Smith's opinion is that Plaintiff "will require a formal chronic pain/functional restoration program to teach her pain-coping skills, prevention of aggravations, a lifelong rehabilitative exercise program, and substitute pain

---

[3] As discussed in the Court's Order [62] Granting as Unopposed Defendant's Motions [43, 47, 54] in Limine, Brown will not be able to diagnose herself with specific mental disorders or draw conclusions about their causation at trial because she is a lay witness.

therapies other than medications and injections." *Id.* He further notes that "[n]one

of her current complaints of anxiety, depression, or insomnia have been determined

to be due to mental anguish or emotional distress, but are due to the effects of

chronic pain with loss of function." *Id.*

Based on his review of her medical records and the interview, Dr. Smith

concludes as follows:

> Ms. Brown has the following diagnoses and associated impairment
> associated with the injury:
> • Pelvis pain due to bilateral superior pubic rami comminuted
>   displaced fractures, right inferior pubic ramus fracture, left sacral
>   ala intra-articular fracture. Status post ORIF bilateral superior
>   ramus fractures and closed reduction percutaneous screw fixation
>   bilateral sacral fractures on [June 25, 2020].
> • Bowel incontinence.
> • Right wrist pain due to healed impacted fracture of the distal
>   radius and ulnar styloid process nondisplaced fracture.
> • Bladder repair on [June 25, 2020] with residual bladder urgency
>   and incontinence.
> • Anxiety and depression.

Doc. [34-3] at 13.

Based on the information discussed above, Dr. Smith "[p]rojected" Plaintiff's

future medical needs and rehabilitation costs. *Id.* at 13. He assumed a life

expectancy of 63.9 more years of life given Plaintiff's age and sex according to the

U.S. Social Security Administration. *Id.* at 12. Dr. Smith's future care projections

can be organized into four buckets: (1) medication; (2) future diagnostic studies and

surgeries for "late sequalae" of her broken bones and bladder rupture; (3) durable

medical equipment ("DME"); and (4) a Functional Restoration Program for pain

management.

As for medication, Dr. Smith opined that Plaintiff has an "ongoing need for

prescription medications including cyclobenzaprine for daily use, which has been effective for the residual symptoms." *Id.* at 13.  He projects Plaintiff will require Cyclobenzaprine (Flexeril) at 10mg per day for 63.9 years, at a total cost of $7,668.00.  *Id.* at 14.

The largest bucket of projected future care costs in the report includes care for "late sequalae" of Brown's ongoing wrist and pelvic pain from broken bones, and for "neurogenic bowel and bladder" problems presumably related to her rupture.  *Id.* at 13.  Dr. Smith predicts that "late sequelae from these injuries and fractures" "will require a much more complete diagnostic evaluation," along with "interventional pain injections and/or surgery."  *Id.*  His projected future care costs also include "[p]re-and post-op diagnostic studies, perioperative medical and facility costs, and post-op therapy [that will] be required."  *Id.*  Dr. Smith's opinions on this care include the following:

- $195,520.00 total in provider visits, including four visits per year for life to an orthopedist, four visits per year for three years to a psychiatrist, four visits per year for three years to a pain management specialist, four visits per year for three years to a neurologist, fifty lifetime visits to a psychotherapist, and twelve visits per year for life to a physical therapist—the physical therapy alone would cost $115,020.00, according to the report;
- $15,438.00 in fourteen total diagnostic studies;
- $57,771.00 in procedures, including one "Wrist Arthroscopy" for $23,438.00 and $34,333.00 in twenty-four total injections of six different types.

*Id.* at 14–15.

As to DME,[4] Dr. Smith projects Plaintiff will need six Neuromuscular

---

[4] In his life care plan, Dr. Smith also projects that Brown will use incontinence pads for life, which will cost $40 per month, totaling $30,672.00.  Doc. [34-3] at 14.  Plaintiff stipulated at the September 21, 2023 Pretrial Conference that she will not seek damages related to gastrointestinal and gynecological needs, so the Court will not address this projection and excludes it from the projected DME costs discussed above.  Originally, Smith projected $41,940.00 in total DME.  *Id.* at 15.

Stimulator units during her life at a cost of $600.00 each, along with two sets of

supplies per year for those units.  *Id.*  The total cost of DME registers at $11,268.00.

*Id.*

The remaining costs in the life care plan cover a Functional Restoration

Program, which includes a three-day evaluation and 160 hours of programming and

costs $27,000.00.  Doc. [34-3] at 15.  In total, Dr. Smith projects Plaintiff's future

medical damages at $345,337.00.

C.    Legal analysis

1.    Relevant legal authority

Plaintiff would like Dr. Smith to testify at trial consistent with the life care

plan that she will require $345,337.00 in future medical costs.  Under Mississippi

law—which the must Court apply in this diversity case—Plaintiff must prove

damages by a preponderance of the evidence.  *TXG Intrastate Pipeline Co. v.*

*Grossnickle*, 716 So. 2d 991, 1016 (Miss. 1997) (citing *Piney Woods Country Life Sch.*

*v. Shell Oil Co.*, 905 F.2d 840, 845 (5th Cir.1990)).  "Damages cannot be based on

mere speculation but must be proved to a reasonable certainty."  *Courtney v. Glenn*,

782 So. 2d 162, 166 (Miss. Ct. App. 2000); *see Potts v. Mississippi Dep't of Transp.*, 3

So. 3d 810, 813 (Miss. Ct. App. 2009) (same).

Under the Federal Rules of Evidence, Plaintiff must have an expert to opine

at trial about her future medical needs because a lay witness can only testify based

on "personal knowledge," Fed. R. Evid. 602, and may not offer opinions "based on

scientific, technical, or other specialized knowledge," Fed. R. Evid. 701(c).  Without

an expert, Plaintiff's future medical needs are merely speculative and inadmissible.

For Dr. Smith to opine at trial on Plaintiff's future medical needs and their

costs, his proffered testimony must comply with Federal Rule of Evidence 702.

Under Rule 702:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Under Rule 702, expert "testimony is admissible only if it is both

relevant and reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

"[T]he Federal Rules of Evidence 'assign to the trial judge the task of ensuring that

an expert's testimony both rests on a reliable foundation and is relevant to the task

at hand.'" *Id.* (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579,

597 (1993)).

Importantly, "nothing in [Rule 702] requires a district court to admit opinion

evidence that is connected to existing data only by the *ipse dixit* of the expert.  A

court may conclude that there is simply too great an analytical gap between the

data and the opinion proffered." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146

(1997).  And Plaintiff, as the party offering Dr. Smith as an expert, "must prove by a

preponderance of the evidence that the proffered testimony satisfies the rule 702

test." *Mathis v. Exxon Corp.*, 302 F.3d 448, 459–60 (5th Cir. 2002).

2.    Discussion

Dr. Smith's testimony fails the foregoing test because it is not "based on sufficient facts or data." Fed. R. Evid. 702(b). His report fails to specify anything in Brown's medical records that directly supports his projections of her future care needs and that those care needs are, to a reasonable degree of medical probability, causally related to the accident. *See Univ. of Mississippi Med. Ctr. v. Lanier*, 97 So. 3d 1197, 1203 (Miss. 2012) ("Because Dr. Galvez's opinion was not based on a reasonable degree of medical probability, this Court finds the testimony was not sufficient to prove causation."); *see also Catchings v. State*, 684 So. 2d 591, 598 (Miss. 1996) (holding that expert testimony "without the use of the words 'to a reasonable medical certainty'" is admissible if, in substance, it "evidences the certainty requisite for admission").

As to the largest category of future care—future diagnostic studies and procedures for late sequelae of her injuries—Dr. Smith does not identify or describe the late sequalae other than residual pain. Even if it is conceivable that ongoing pain from Brown's injuries may require future diagnostic studies and a wrist surgery, Dr. Smith's report does not connect any of the specific instances of future medical care that he projects in his plan to any specific recommendations by any of Brown's treating physicians. *See* Doc. [34-3] at 13–15. Nor will Plaintiff offer medical testimony at trial to predict her future care needs more specifically, as counsel acknowledged at the hearing held on September 21, 2023, that none of the

treating physicians will opine as to the need for any future treatment.  The Court

cannot simply take Dr. Smith's word for it that Brown will require all of the medical

care that he lists in his life care plan.  *Ipse dixit* will not suffice.

If anything, many of the medical records Dr. Smith recites undermine his

projections.  Plaintiff stated in her interview with Dr. Smith that her orthopedist

and urologist had released her.  Doc. [34-3] at 9.  The report appears to indicate she

is no longer seeing a physical therapist; her "[f]inal visit" to physical therapy was on

October 27, 2020, during which she "report[ed] of improved pain symptoms."  *Id.* at

7.  And under current treatments Brown is purportedly receiving, Dr. Smith lists a

home exercise program but not physical therapy.  Nor are any surgeries scheduled.

*Id.* at 9.  Dr. Smith even projects twelve future neurologist visits even though he

cites no records of her receiving neurology care after the accident.  *Id.* at 14.

Indeed, Plaintiff "denie[d] head injury" right after the accident, and her CT scan at

the hospital revealed "no significant abnormality."  *Id.* at 4.

Dr. Smith's projections of Brown's other future care needs are likewise based

on insufficient facts or data.  As to the future projections for drug costs, Brown *is*

taking Flexeril currently, according to the report.  *See id.* at 11.  But just because

she currently takes the drug and it "has been effective," *id.* at 13, does not mean she

*will* need to take the drug for the rest of her life, and Dr. Smith does not explain in

any detail why she will have spasms requiring Flexeril for life.  Rather, he declares

that she "has an ongoing need" for the drug "for daily use," which does not mean the

same thing as "as needed for spasms," her reported current usage.  *Id.* at 13, 11.

11

Dr. Smith's prediction about Brown's future need for Flexeril therefore fails to

satisfy Rule 702(b)'s standard.

Similarly, the projections of Brown's future need for DME are insufficiently

reliable under Rule 702(b).   As to the Neuromuscular Stimulator unit, Dr. Smith

opines that "Brown has chronic pain and will benefit from prolonged use of a

neuromuscular stimulator" because "[i]t is expected to reduce pain levels and

spasms and improve functionality."  Doc. [34-3] at 13.  But he does not explain why

Brown will have lifetime problems with pain and spasms or how the stimulator

would improve those symptoms.  Nor does he cite any doctor's recommendation for

this treatment, apparently relying entirely on Plaintiff's own statement during his

interview with her that "her mother has a transcutaneous electrical nerve

stimulation (TENS) unit and that she would like to try one at home."  *Id.* at 11.

Plaintiff's desire to "try" a medical treatment and Dr. Smith's subsequent statement

that she "will benefit" from it are not sufficient for a reliable prediction that

Plaintiff requires the treatment, let alone for life.

The last medical care projection is the Functional Restoration Program.  To

support this prescription, Dr. Smith refers to "current treatment guidelines (ODG)."

Doc. [34-3] at 13.  He opines that Brown "is expected to have long-term issues with

bowel and bladder incontinence," that she "has anxiety and depression that started

after the injury," and that she has "significant functional losses," which all combine

with worries about future treatments and financial barriers to treatment.  *Id.* at

13–14.  And he notes that the "program is provided after she completes all

necessary treatment and is in addition to the supportive psychotherapy sessions and psyche medication management that will be required while she is undergoing treatment." *Id.* at 14.

However, the report does not point to sufficient facts or data to support this prediction. Again, no treating physician has recommended this program for Brown. Dr. Smith interviewed Brown and reviewed her medical records, but he did not examine her himself. Other than generally citing "current treatment guidelines" without further explanation, Dr. Smith renders the conclusory statement that Brown experiences pain and psychological distress and that a Functional Restoration Program can benefit one with such symptoms. Doc. [34-3] at 13–14. Nor does he discuss the contents of a Functional Restoration Program or how they might overlap with other treatments—such as the twelve physical therapy visits per year for life—that he projects Brown will need. *See id.* at 14–15. The evidence Dr. Smith cites is insufficient for a doctor to reasonably find a $27,000.00, 160-hour program medically necessary. *See Kumho Tire*, 526 U.S. at 152 ("*Daubert*'s gatekeeping requirement . . . . is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field").

To be sure, "[a]s a general rule, questions relating to the bases and sources of an expert's opinion affect the *weight* to be assigned that opinion rather than its *admissibility* and should be left for the jury's consideration." *Primrose Operating*

*Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004) (alteration and emphases

in original) (internal quotation marks and citation omitted).  But there is an

important difference between a seemingly weak basis for expert testimony and an

insufficient one.  Dr. Smith's life care plan does not evince that he based his

predictions on sufficient medical evidence to predict Brown will require the medical

care that he budgeted for her in his report.  Although Dr. Smith is a medical doctor,

he was only designated to produce a projection of future medical care costs.  Doc.

[34-1] at 1.  He did this without a sufficient basis in the medical evidence to support

the medical need for such future care.

Nor is this a case where the patient has a diagnosed and identifiable,

permanent injury—such as a "permanent spinal cord injury"—and the life care

planner bases "the majority of [his] recommendations" on "current medical daily

care and treatments and services that have, in fact, been prescribed or

recommended by a treating physician." *Green v. Polyester Fibers, LLC*, No. 1:13-

CV-00234-SA-DAS, 2015 WL 6158813, at *2 (N.D. Miss. Oct. 20, 2015), *order

clarified*, No. 1:13-CV-00234-SA-DAS, 2015 WL 12999744 (N.D. Miss. Oct. 22, 2015)

(internal quotation marks omitted).  While Brown was surely injured, the medical

records Dr. Smith discusses in his report do not show that she has an ongoing,

specific, permanent injury.  The records also lack any doctor's recommendations for

future care.  And while it is possible that Plaintiff may experience pain in the

future, even the "chronic pain syndrome" from which Dr. Smith makes the

conclusory statement that Brown suffers "has not been diagnostically evaluated or

treated," according to his report. Doc. [34-3] at 12. In this case, "there is simply too great an analytical gap between the data and the opinion proffered." *General Elec.*, 522 U.S. at 146.

The Court also concludes that the opinions expressed in Dr. Smith's life care plan are inadmissible under Federal Rule of Evidence 403. For the reasons discussed previously, the Court finds that the "probative value" of Dr. Smith's life care plan "is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [and] misleading the jury" about the extent of Plaintiff's future medical needs and their costs. Fed. R. Evid. 403. Accordingly, the Court will grant Defendant's Motion [49] in Limine.

## II. CONCLUSION

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that, Defendant BellSouth Telecommunications, LLC's Motion [49] in Limine to Limit Testimony of Plaintiff's Retained Expert, Gregory L. Smith, M.D., M.P.H., is **GRANTED**, and Plaintiff's Retained Expert, Gregory L. Smith, M.D., M.P.H., is precluded from testifying at trial to the opinions in his life care plan.

**SO ORDERED** this the 19th day of October, 2023.

*s/ Halil Suleyman Ozerden*
HALIL SULEYMAN OZERDEN
UNITED STATES DISTRICT JUDGE